**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Orbin Mauricio Henriquez Serrano,<br><br>Plaintiffs,<br>v.<br><br>United States of America,<br><br>Defendant. | Case No. ____________________<br><br><br>**COMPLAINT** |

Plaintiff Orbin Mauricio Henriquez Serrano, by his attorney, brings this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346(b) and 28 U.S.C. Chapter 171.

## INTRODUCTION

1. On January 11, 2026, Mr. Henriquez Serrano, an immigrant from Honduras, was simply driving to work when he stopped for gas and an energy drink at a Speedway in St. Paul, MN. Instead of continuing his day, federal immigration agents under the command of Gregory Bovino racially profiled, assaulted, and beat Mr. Henriquez Serrano to unconsciousness in front of horrified witnesses. The gross attack, mere days after federal agents killed Renee Good, was shocking and terrifying. Agents shattered his car window, hit him with a hammer, pulled on his neck, twisted his knee, hurting him to the point that he lost consciousness.

2. Agents carried Mr. Henriquez Serrano's unmoving body into a black SUV.




3. When he awoke, he found himself in a dystopian horror story. Instead of getting medical attention, he was moved to a detention center in Texas. There, another inmate died. His death ruled a suicide, but rumors of murder circled in the facility.

4. Without explanation and without being able to talk with an attorney, Mr. Henriquez Serrano was put on a plane and deported to Honduras, the country from which he was seeking asylum.

5. The federal agents had no legal authority to treat Mr. Henriquez Serrano as they did. The federal agents disregarded the United States' own policies regarding use of force, their arrest power, and medical treatment of detainees, among others.

## PARTIES

6. Orbin Mauricio Henriquez Serrano is 28-year-old man currently living in Honduras.

7. The United States of America is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, the U.S. Department of Homeland Security, its component agencies, such as the U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

8. At all relevant times, upon information and belief, the agents were deployed for Operation Metro Surge, were using federal vehicles and equipment, were wearing federally supplied tactical gear, and used federal facilities.

9. At all relevant times, federal officers referenced in this Complaint were employees of the United States, working within the scope and course of their employment in these federal agencies.

10. At all relevant times, the federal officers referenced in this complaint were "investigative or law enforcement officers" within the definition of 28 U.S.C. § 2680(h).

## JURISDICTION AND VENUE

11. This Court has jurisdiction over Mr. Henriquez Serrano's claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

12. Mr. Henriquez Serrano has exhausted all available administrative remedies pursuant to 28 U.S.C. § 2675.

13. Mr. Henriquez Serrano filed an administrative complaint with the United States Department of Homeland Security, US Customs and Border Protection, and US Immigration and Customs Enforcement on or about April 15, 2026, under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking redress for the tortious conduct of the officers and the damages he received.

14. The administrative complaints were sent both by electronic mail as well as US postal service certified mail.

a. CBP acknowledged receipt of the administrative claim on April 21, 2026.
b. DHS did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on May 1, 2026.
c. ICE did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on April 20, 2026.

15. Six months have now elapsed with no decision from DHS, CBP, ICE or any other agency. The claims are therefore deemed denied. 28 U.S.C. § 2675(a). Plaintiff has exhausted his administrative remedies, and this action is timely under 28 U.S.C. § 2401(b).

## FACTS

16. Orbin Mauricio Henriquez Serrano was born in Honduras and came to the United States six years ago. Mr. Henríquez Serrano worked as an assistant manager and a line cook at a local tavern.

17. On January 11, 2026, Mr. Henriquez Serrano stopped at a Speedway gas station located at or near 56 Snelling Ave N, St Paul, MN 55104 while on his way to work.

18. Mr. Henriquez Serrano purchased a Red Bull and walked back towards his vehicle.

19. As he approached his vehicle, he saw immigration agents with vests marked "ICE," "Border Patrol," and "POLICE" enter the Speedway.

20. Other customers at the Speedway pulled out cameras and began to film the agents, a common practice during Operation Metro Surge. Bystander video helped document many of the excessive violations by federal agents that occurred during this time.

21. Mr. Henriquez Serrano continued to walk to his vehicle.

22. The agents were seemingly being led by Gregory Bovino.



23. Mr. Bovino came not with a few agents but nearly twenty. They had no plan or orders other than find Hispanic looking people and to antagonize Minnesota residents into retaliating against the agents.

24. Mr. Bovino's actions during Operation Metro Surge horrified even local US prosecutors. In a report by CNN, Mr. Bovino, upset at the conduct of Minnesota observers, told prosecutors that "We're going to pacify this place, we're going to roll 'em up."[1]

[1] Jake Trapper, CNN Politics, "18 Days in Minnesota: How immigration agents killed 2 US citizens," (July 22, 2026), https://www.cnn.com/2026/07/22/politics/jake-tapper-minnesota-immigration-shootings.

25. When an agent saw Mr. Henriquez Serrano he demanded, based on Mr. Henriquez Serrano's Hispanic appearance, that Mr. Henriquez Serrano tell him his name and immigration status.

26. Despite the Speedway being completely full with dozens of other people, the agents profiled Mr. Henriquez Serrano based solely on his Hispanic appearance.

27. The agents did not ask any people who did not look Hispanic at the Speedway for their names or immigration status.

28. The agents did not have an arrest warrant for Mr. Henriquez Serrano.

29. Agents had no reason to believe that Mr. Henriquez Serrano was in violation of any immigration or federal law.

30. Racially profiling Mr. Henriquez Serrano violated DHS and CBP policies.[2]

31. Mr. Henriquez Serrano told the agent he would not speak with him without a lawyer and got into his car.

32. The agents surrounded his car and would not let him leave.

---

[2] CBP Use of Force – Administrative Guidelines and Procedures Handbook, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, Appx. II *citing and reprinting* Secretary Napolitano, *DHS Commitment to Nondiscriminatory Law Enforcement and Screening Activities*, April 26, 2013. ("It is the policy of DHS to prohibit the consideration of race or ethnicity in our daily law enforcement and screening activities in all but the most exceptional instances, as defined in the DOJ Guidance. DHS personnel may use race or ethnicity only when a compelling governmental interest is present, and only in a way narrowly tailored to meet that compelling interest.").




33. Agent Bovino and several of his agents began to push back on the witnesses and threaten them in an attempt to escalate the situation.

34. The witnesses kept filming.

35. Upon information and belief, several agents were also filming the events and taking pictures with their personal cell phones.

36. Inside his car, Mr. Henriquez Serrano heard the agents demand that he identify himself again.

37. He again refused, saying he would not talk with them without an attorney.

38. Mr. Henriquez Serrano assumed that he was potentially safe in his car, at least until he could get ahold of an attorney. He did not think the agents could do

anything except stand outside his car, especially since they lacked any reason to believe he was in violation of immigration laws and were merely racially profiling him.

39. Unfortunately, the agents decided to continue the illegal arrest. An agent used a hammer and broke Mr. Henriquez Serrano's driver's side window.



40. The agent gave no warning before he broke the window.

41. Agents opened the door and reached inside, grabbing Mr. Henriquez Serrano by his head and neck and began pulling him.

42. Agents on the other side of the car began banging on the passenger door and window with a baton.

43. An agent assaulting Mr. Henriquez Serrano paused and used the driver's door console to begin lowering the passenger side windows and unlocking the passenger side door.



44. Agents then entered the passenger side door and began to pull Mr. Henriquez Serrano out through the passenger side while other agents were pulling him the other way.




45. One agent hit Mr. Henriquez Serrano on his hand with the hammer that was used to break the driver's side window.

46. Agents pulled Mr. Henriquez Serrano out through the passenger door. He fell on the ground, next to his car.

47. Agents kept attacking him.

48. One agent called him an "asshole" in Spanish and several agents were swearing at him in English.

49. At the same time, Bovino failed to maintain proper supervision. Instead, he was "snarling at protesters."[3]



50. At least one agent attacked an observer.



---

[3] Matt Shuham, HuffPost, "Inside the Invasion of Minneapolis," (January 15, 2026), https://www.huffpost.com/entry/minneapolis-trump-ice-local-resistance_n_6966ad39e4b0dd199b1aa10d.

51. Agents violently pressed Mr. Henriquez Serrano onto the ground, placing their knees on his back and neck, with half his shirt coming off.



52. Mr. Henriquez Serrano had knee surgery in 2022. Agents twisted his knee, causing him to scream in pain while other agents applied significant pressure to Mr. Henriquez Serrano's back while he was on the ground, causing him to lose consciousness and become unresponsive.



53. The agents either failed to notice that Ms. Henriquez Serrano was no longer conscious or they didn't care. Instead, they kept yelling at his defenseless and motionless body.

54. The agents pulled his unconscious body away from his vehicle.



55. Instead of seeking medical aid for Mr. Henriquez Serrano, the agents piled on him, pinning him to the ground as other officers attempted to put handcuffs on him.



56. Because he was unconscious and because other agents added additional weight to his prone body, agents had trouble pulling his arms out to put the handcuffs on.



57. Witnesses were horrified and many believed that the agents had killed Mr. Henriquez Serrano.

58. Defendant's actions violated nearly every aspect of 8 C.F.R. § 287.8(c), the regulation dealing with arrests.

59. After he was handcuffed, agents turned him on his side and appeared to yell at him despite him being unconscious.



60. Upon information and belief, when agents realized that Mr. Henriquez Serrano was unconscious, they were required to render medical aid immediately and not to move him until they had an understanding of his injuries.[4]

61. Instead, refusing to provide him with medical attention, the agents pulled him up into a sitting posture.



62. As he was unconscious, he could not walk, so the agents moved him forward and another agent grabbed his leg as they walked him toward an immigration vehicle.

[4] See CBP Use of Force – Administrative Guidelines and Procedures Handbook, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, Ch. 3 § A(5)(d)(2).



63. The sight of federal agents violently attacking Mr. Henriquez Serrano and carrying his lifeless body away was horrible.





64. Agents brought him to their rented SUV and placed him awkwardly in the back seat. Injuries to his face from the attack were now clearly visible just moments after the attack.



65. He was transported him to the Whipple Building. During the ride, Mr. Henriquez Serrano woke up and requested that he be brought to the hospital. The agents refused.

66. Upon information and belief, refusal to provide medical care at that time violated CBP policies.[5]

67. Mr. Henriquez Serrano did not receive medical attention for the multiple injuries he sustained during his arrest.

68. Video of the encounter went viral and was carried by several local and national news stations.[6] News reports included the information that Mr. Henriquez Serrano had no criminal records in the United States.[7]

69. In response to the backlash, DHS issued a statement falsely claiming that the agents gave Mr. Henriquez Serrano "lawful orders" and waited "several minutes" before shattering his windows.[8]

---

[5] See CBP Use of Force – Administrative Guidelines and Procedures Handbook, Law Enforcement Safety and Compliance Directorate Operations Support, January 2021, Ch. 1, p 11 (Following any incident involving the use of force, Authorized Officers/Agents shall seek medical assistance for any person who appears, or claims to be injured, or as otherwise required by subsections of this policy.)

[6] Mara H. Gottfried, Pioneer Press, "Honduran detained at St. Paul gas station now in Texas, sister says" (January 15, 2026),https://www.twincities.com/2026/01/15/st-paul-gas-station-arrest-feds/ Athena Dawson, The Mirror US, "Horrific video shows Border Patrol agents dragging limp body out of vehicle in Minnesota, (January 14, 2026), https://www.themirror.com/news/us-news/orbin-mauricio-henriquez-serrano-cbp-1619023

[7] KARE 11 "Man in viral ICE arrest video now held in Texas" Jan 14, 2026, available at https://www.youtube.com/watch?v=259qP-idFv4

[8] Homeland Security (@DHSgov), X, (January 12, 2026 at 1:53 PM), https://x.com/DHSgov/status/2010802240517521519.

70. At the Whipple building, he again requested to see a doctor but his requests were denied.

71. The following morning, Agents put Mr. Henriquez Serrano hands and feet in shackles and he was taken to the airport where was transported to the El Paso Camp East Montana in Texas, a notorious federal government detention facility.

72. Mr. Henriquez Serrano spent over a week imprisoned at Camp East Montana. He was housed in unsanitary conditions, crammed with 80 people into one dormitory. He asked for medical attention while in custody because of the pain in his knee, but he was not given anything other than a Tylenol, several days after he arrived.

73. While in custody, another inmate, Victor Manual Diaz, died. ICE claimed it was a suicide. This was the second death in mere weeks at the detention center. ICE claimed the first death, that of Geraldo Lunas Campos, a 55-year-old Cuban man, was a suicide. However, the El Paso Medical examiner ruled it a homicide. ICE refused to let the El Paso Medical Examiner conduct an autopsy on Mr. Diaz, instead giving the autopsy to the US army.

74. Inside the detention facility, there were rumors that the guards murdered Mr. Diaz.

75. Mr. Henriquez Serrano was afraid that guards would harm him as well.

76. While in El Paso, Mr. Henriquez Serrano was not given an opportunity to speak to a lawyer. He was trying to pursue an asylum claim but didn't see a judge.

77. After about a week in El Paos, he was shackled again and brought with other immigrants to the airport and flown to Honduras.

78. When he landed in Honduras, he was brought to a bus terminal where he reached out to a relative who helped him find transportation to a remote area of his country. He has nightmares about what happened to him and lives every day in fear.

79. Medical exams in Honduras showed that his ACL reconstruction from 2022 was damaged. Findings suggested a "graft re-tear at the mid-substance" as well as a "Grade III tear versus prior partial meniscectomy."

80. On information and belief, the agents knew that none of the actions of Mr. Henriquez Serrano permitted them to use the level of force that they did. As explained to the NY Times by Gregory Albert, a professor of criminology and criminal justice at the University of South Carolina, who was asked about the viral video by the Times, stated that shattering a window and pulling someone out of their car can escalate an encounter significantly, and would only be suitable in a situation in which the federal agents had probable cause to suspect that the target had committed a violent crime like murder, rape or robbery.[9]

81. The agents lacked such probable cause as to Mr. Henriquez Serrano.

---

[9] Elena Shao, Arijeta Lajka, Helmuth Rosales, Raj Saha, NYTimes, "Videos Showing Aggressive ICE Tactics in Minnesota Fuel a Backlash," (January 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/minnesota-ice-violence-tactics-videos.html.

82. Further, no reasonable federal law enforcement officer can demand identification merely based on a Latino appearance. Agents had no idea who Mr. Henriquez Serrano was when they began their encounter with him, merely that he looked Hispanic. Racial profiling of immigrants violates DHS, CBP, and ICE training, policies, and regulations.

83. Agents all knew that they "must not make interior immigration stops or arrests based on race or ethnicity." *Trump v. Illinois*, 146 S.Ct. 432, 436 n.4 (2025)(J. Kavanaugh concurring) (*citing Whren v. United States*, 517 U.S. 806, 813 (1996)).

84. No reasonable federal law enforcement officer could believe that racially profiling Mr. Henriquez Serrano at a gas station in St. Paul was legally permitted.

85. Mr. Henriquez Serrano's arrest violated DHS policy in several regards, including the requirements of a warrantless arrest. Before making a warrantless arrest, 8 U.S.C. § 1357(a)(2) requires that for any warrantless arrest made by immigration officials, that the officials make determinations that the immigrant was a flight risk and in violation of immigration laws. Agents did neither.

86. Upon information and belief, a group of agents in the field will have an assigned supervisor or an agent in charge with responsibility to ensure other agents comply with the law, including the appropriate policies and regulations, and their duties. The supervisor or agent in charge of the agents described in this Complaint was negligent in allowing officers to racially profile Mr. Henriquez Serrano, to shatter his car window, to

forcefully pull him from the car, to ignore his medical condition and fail to provide appropriate medical care.

87. Upon information and belief, this group of agents was led by Gregory Bovino.

88. However, instead of following required policies on racial profiling and warrantless arrests, Mr. Bovino publicly asserted an unbounded stop authority: "I can question anyone anywhere in the United States as to their citizenship . . . and our agents are trained to do that."[10]

89. Indeed, racial profiling was a necessary and expected part of Operation Metro Surge. Mr. Bovino specifically targeted Hispanic looking individuals. His methods were a matter of judicial record: During Operation Midway Blitz in Chicago, an operation he led only weeks before Operation Metro Surge, a federal judge found that he had been "outright lying" about the use of force, including his own, and ordered him to wear a body camera and to ensure that agents under his command displayed visible identifiers; he had also twice before been subject to court orders arising from racial profiling in operations he led.[11]

90. The Defendant's anti-immigrant animus is still very much alive. Mere days after the midterm elections, the White House posted on X a tweet declaring "America is for Americans."[12]

---

[10] *See* Compl. *Ganger v. Ross*, p. 272, 26-cv-4231 (LMP/DJF), (D. Minn, Oct.1, 2026).
[11] *Id*. p. 267.
[12] The White House (@WhiteHouse), X, (Nov. 3, 2026 at 3:50 PM).

91. The use of force used against Mr. Henriquez Serrano was excessive and violated DHS policy regarding the use of force.[13]

92. Further, the excessive use of force by law enforcement agents "will not be tolerated" and those who witness and fail to report such misconduct should be subjected to both administrative and criminal penalties, per the policy memo.

93. Upon information and belief, no agent even wrote up a use of force report for the attack on Mr. Henriquez Serrano.

94. The entirety of the attack and arrest of Mr. Henriquez Serrano was a complete failure of training and supervision.

95. The agents acted irrationally and conducted themselves unprofessionally, leading to criminal acts on Mr. Henriquez Serrano, including assault and battery and false arrest.

96. Mr. Henriquez Serrano suffered both physical and mental distress as well from the attack.

97. His distress has manifested itself in nightmares, anxiety, and trouble sleeping.

98. The physical injuries to his knee remain. Mr. Henriquez Serrano will need surgery in Honduras to repair the damage made by Defendant.

---

[13] Alejandro N. Mayorkas, Department of Homeland Security, *Memo: Update to the Department Policy of the Use of Force* (February 6, 2023). https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.

# CLAIMS FOR RELIEF

## First Claim for Relief
## Federal Tort Claims Act – Assault

99. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

100. Under the FTCA, the United States is liable for the tortious acts of its agents, employees and officers.

101. As reflected by the actions alleged in this Complaint, federal agents acted with the intent to cause Mr. Henriquez Serrano to experience fear or apprehension of imminent harm or offensive contact while he was in his vehicle by menacing him with hammers, batons, curses, and threats of violence.

102. At the time of these actions, the federal agents had the apparent ability to cause the harm and offensive contact to Mr. Henriquez Serrano.

103. Mr. Henriquez Serrano had a reasonable apprehension or fear that imminent harm and offensive contact would occur without significant delay.

104. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of the United States, directly and proximately caused Mr. Henriquez Serrano to suffer mental and physical injuries.

105. The actions of the federal agents constitute the intentional tort of assault under Minnesota law, for which Defendant is liable for damages.

## Second Claim for Relief
## Federal Tort Claims Act – Battery

106. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

107. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

108. As reflected by the actions alleged in this Complaint, the federal agents intentionally caused harmful or offensive contact with Mr. Henriquez Serrano including but not limited to physically striking him with their fists and with objects, shattering his window, pulling him, knocking him to the ground, twisting his knee, and physically harming him past the point of losing consciousness.

109. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Mr. Henriquez Serrano to suffer mental and physical injuries.

110. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

111. The actions of the federal agents constitute the intentional tort of battery under Minnesota law, for which Defendant is liable for damages.

**Third Claim for Relief**
**Federal Tort Claims Act – False Arrest/False Imprisonment**

112. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

113. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

114. As reflected by the actions alleged in this Complaint, the federal agents unlawfully racially profiled Ms. Henriquez Serrano at the Speedway gas station, ignored the requirements of a warrantless arrest, and then intentionally restricted the physical liberty of Mr. Henriquez Serrano by words and act, including but not limited to boxing in his vehicle, physically detaining and handcuffing him, and transporting Mr. Henriquez Serrano towards the Whipple Federal Building against his will, being held there and in Texas for several days.

115. Mr. Henriquez Serrano was aware of the words and acts of the federal agents and were harmed by them.

116. The federal agents used physical barriers including but not limited to hand cuffs, car doors and physical force, and the threat of the use of immediate physical force to intentionally restrict the physical liberty of Mr. Henriquez Serrano. At all relevant times, Mr. Henriquez Serrano believed that the federal agents had the ability (though not the lawful authority) to carry out their threats of physical force.

117. The agents who arrested Mr. Henriquez Serrano violated and exceeded any legal authority they had to make arrests for violations of immigration or federal laws.

118. The agents, officers, and employees of the United States violated and exceeded any legal authority they had to imprison Mr. Henriquez Serrano for any time period.

119. The restriction on Mr. Henriquez Serrano physical liberty was complete, with no reasonable means of escape known to him once the restriction began.

120. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Mr. Henriquez Serrano to suffer mental and physical injuries.

121. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

122. The actions of the federal agents constitute the intentional tort of false imprisonment and false arrest under Minnesota law, for which Defendant is liable for damages.

## Fourth Claim for Relief
## Federal Tort Claims Act – Negligence and Negligent Supervision

123. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

124. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

125. The United States has duty of care for training, supervision, and a general standard of care. The agents, officers, and employees of the Defendant had a legal duty of care to Mr. Henriquez Serrano to, among other things, follow the federal laws faithfully regarding use of force, racial profiling, warrantless arrests, and medical care, among others. The Defendant also had a duty to supervise and properly train its agents to follow the correct standard relating to use of force, racial profiling, warrantless arrests, medical care, and providing medical assistance.

126. An agent in charge or supervisory agent was responsible for the supervision of the group of agents who violated Mr. Henriquez Serrano legal rights and failed to satisfy that responsibility by negligently supervising the team of agents.

127. By engaging in the unlawful and unprivileged acts described in this Complaint, including but not limited to committing assault and battery against Mr. Henriquez Serrano, and failing to provide for appropriate medical assistance for him, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Mr. Henriquez Serrano to suffer mental and physical injuries.

128. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise or performance of discretionary functions or duties.

129. The action of the United States constitutes negligence under Minnesota law, for which Defendant is liable for damages.

**Fifth Claim for Relief**
**Federal Tort Claims Act – Trespass to Chattel**

130. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

131. Under Minnesota law, a trespass to chattel occurs by intentionally 1) dispossessing an individual of the chattel; or 2) using or intermeddling with a chattel in the possession of another person.

132. Agents intentionally interfered with Mr. Henriquez Serrano's personal property when they, without any lawful basis, smashed the driver's side window of his car.

133. At no time did any agent of the federal government repair or cover the cost to Mr. Henriquez Serrano's vehicle.

134. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Mr. Henriquez Serrano to suffer mental and physical injuries.

135. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise or performance of discretionary functions or duties.

136. The action of the United States constitutes trespass to chattel under Minnesota law, for which Defendant is liable for damages

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A. Finding, adjudging, and declaring the United States has engaged in the violations of law alleged herein;

B. Awarding Plaintiff compensatory damages of $1,015,000;

C. Awarding Plaintiff costs and disbursements; and

D. Awarding any and all other additional relief as permitted by law and found by this court to be justified and appropriate.

Dated: November 12, 2026

*/s/ Ian Bratlie*

Ian Bratlie (0319454)
Bratlie Law Office
931 Madison Ave
Suite 206
Mankato, MN 56001
(918) 805-0654
ianbratlie@bratlielawoffice.com